**RECORD NO. 16-7726**

In The

# United States Court Of Appeals
## For The Fourth Circuit

## UNITED STATES OF AMERICA,

*Petitioner – Appellee,*

v.

## THOMAS BLACKLEDGE,

*Respondent – Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
AT RALEIGH**

———————————

## BRIEF OF APPELLANT

———————————

Lawrence H. Brenner
Sarah L. Greene
BRENNER & BRENNER
P. O. Box 787
Carrboro, NC  27510
(252) 349-0662

*Counsel for Appellant*

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF JURISDICTION ..................................................... 1

ISSUES PRESENTED FOR REVIEW ................................................. 2

STATEMENT OF THE CASE ............................................................. 3

    Statement of Facts .......................................................................... 5

SUMMARY OF ARGUMENT .......................................................... 11

ARGUMENT ..................................................................................... 13

    Standard of Review ....................................................................... 13

I.    THE GOVERNMENT FAILED TO ESTABLISH THAT MR.
    BLACKLEDGE WOULD HAVE "SERIOUS DIFFICULTY"
    IN REFRAINING FROM SEXUALLY VIOLENT CONDUCT
    OR CHILD MOLESTATION, AND THUS THE
    COMMITMENT SHOULD BE OVERTURNED ........................... 14

    A.    In finding that Mr. Blackledge lacks volitional control,
        the court credited unsubstantiated opinion over scientific
        consensus ................................................................................ 16

        1.    The court's opinion evidences no acknowledgment
            or deliberation of Dr. Wood's testimony on the
            utter lack of evidence available on recidivation
            rates after age 70 ............................................................ 17

        2.    The only purportedly scientific evidence that the
            court relied upon was a study not admitted into
            evidence and of no probative value ................................ 24

B.    Even the court's particular factfinding on the nature of Mr. Blackledge's mental illness under Prong Two contributed to a clearly erroneous finding on the question of volitional impairment ................................................................... 27

C.    The district court placed undue emphasis on Mr. Blackledge's criminal history, giving too little weight to his present mental condition ...................................................... 30

II.    BECAUSE IT SERVES NO STATUTORY PURPOSE, BUT ONLY EXTENDS HIS PUNISHMENT, MR. BLACKLEDGE'S COMMITMENT VIOLATES THE EX POST FACTO CLAUSE AND SHOULD BE OVERTURNED ....... 36

CONCLUSION ........................................................................ 42

REQUEST FOR ORAL ARGUMENT .................................................. 46

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

ii

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Addington v. Texas*,
    441 U.S. 418 (1979) ..................................................................................15

*Allianz Insurance Co. v. Taylor*,
    62 B.R. 846 (Bankr. E.D. Va. 1986) .........................................................25

*Does #1-5 v. Snyder*,
    834 F.3d 696 (3d Cir. 2016) ......................................................37, 39, 40, 41

*Illinois v. Coan*,
    57 N.E.3d 1282 (Ill. App. 2016) ................................................................44

*Kansas v. Crane*,
    534 U.S. 407 (2002) .............................................................................15, 43

*Kansas v. Hendricks*,
    521 U.S. 346 (1997) .........................................................................39, 42, 43

*Matherly v. Andrews*,
    817 F.3d 115 (4th Cir. 2016) .....................................................................42

*Qinetiq US Holdings, Inc. v. Commissioner of Internal Revenue*,
    845 F.3d 555 (4th Cir. 2017) ..................................................................... 13

*Smith v. Doe*,
    538 U.S. 84 (2003) .....................................................................................39

*United States v. Antone*,
    742 F.3d 151 (4th Cir. 2014) .............................................................*passim*

*United States v. Blackledge*,
    751 F.3d 188 (2014) ....................................................................................4

*United States v. Carter*,
    669 F.3d 411 (2012) ..................................................................................22

*United States v. Comstock*,
    560 U.S. 126 (2010)........................................................................3

*United States v. Cook*,
    565 Fed. Appx. 193 (4th Cir. 2014) ........................................12, 35

*United States v. Francis*,
    686 F.3d 265 (4th Cir. 2012)............................................. 14, 24

*United States v. Hall*,
    664 F.3d 456 (4th Cir. 2012) .......................................................14

*United States v. Maclaren*,
    2013 WL 12188327 (E.D.N.C. 2013) ..........................................34

*United States v. Olano*,
    507 U.S. 725 (1993)......................................................................13

*United States v. Ramirez-Castillo*,
    748 F.3d 205 (4th Cir. 2014)................................................. 13, 41

*United States v. Springer*,
    2012 WL 3957857 (E.D.N.C. 2012), *aff'd*, 715 F.3d 535 (4th Cir. 2013) ...15

*United States v. Wooden*,
    693 F.3d 440 (4th Cir. 2012) ...............................................*passim*

*Young v. State of Washington*,
    86 F.3d 810 (Wash. App. 2004) ...................................................22

**Statutes:**

18 U.S.C. § 1848..............................................................................36

18 U.S.C. §§ 4247-48
    (Adam Walsh Child Protection and Safety Act of 2006).....................*passim*

18 U.S.C. § 4247(a) .........................................................................11, 14

18 U.S.C. § 4247(a)(6).......................................................................43

18 U.S.C. § 4248................................................................3, 23, 40, 44

18 U.S.C. § 4248(d) ..................................................................11, 14

28 U.S.C. § 1291 ............................................................................1

28 U.S.C. § 1331 ............................................................................1

**Constitutional Provision:**

U.S. Const. art. 1, § 9 ..................................................................36

**Rule:**

Fed. R. Evid. 703 ........................................................................25

## STATEMENT OF JURISDICTION

The district court had jurisdiction over the civil commitment proceedings pursuant to the Adam Walsh Child Protection and Safety Act of 2006, codified at 18 U.S.C. §§ 4247-48; and federal question jurisdiction under 28 U.S.C. § 1331. Final judgment was entered on November 16, 2016; notice of appeal was filed on December 15, 2016. J.A. 712, 715. This Court has jurisdiction over this timely appeal filed from a final order pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1.    Whether the government failed, as a matter of law, to establish that Mr. Blackledge would have "serious difficulty" in refraining from sexually violent conduct or child molestation, and thus whether the commitment should be overturned.

2.    Whether the court committed Mr. Blackledge in violation of the constitutional prohibition against ex post facto lawmaking.

## STATEMENT OF THE CASE

On September 15, 2009, eight days before the date of his projected release from FCI Butner, the government certified Thomas Blackledge as a sexually dangerous person pursuant to the Adam Walsh Act, 18 U.S.C. § 4248. J.A. 18-23. The Federal Public Defender's Office was appointed as counsel for Mr. Blackledge in June 2010, following the resolution of *United States v. Comstock*, 560 U.S. 126 (2010). D.E. 2.

The Federal Public Defender moved for the appointment of Dr. Terence Campbell on July 27, 2011, and the court appointed Dr. Campbell as an expert on August 4, 2011. D.E. 18-19. Dr. Campbell rendered an opinion that Mr. Blackledge was sexually dangerous. D.E. 24.

On October 11, 2011, Mr. Blackledge filed a motion to appoint Dr. Joseph Plaud as an additional court examiner. D.E. 27. The motion was denied without prejudice on November 4, 2011. D.E. 30. On June 14, 2012 Mr. Blackledge filed a renewed motion to appoint Dr. Plaud. D.E. 47. The court denied Mr. Blackledge's motion on July 2, 2012. D.E. 50.

On July 10, 2012, the Federal Public Defender filed a motion to withdraw as counsel on the grounds of an internal conflict with Mr. Blackledge. D.E. 51. A hearing was held on July 18, 2012, and the motion to withdraw was denied. D.E. 57. The Federal Public Defender appealed the court's denial of the motion to

3

withdraw on July 23, 2012. D.E. 58. While the appeal was pending, a bench trial was held on August 10, 2012, and the court committed Mr. Blackledge as a sexually dangerous person the same day. D.E. 75-76.

In *United States v. Blackledge*, 751 F.3d 188 (2014), the Fourth Circuit held that the district court's denial of the motion to withdraw as counsel was an abuse of discretion. Following the Fourth Circuit decision, the district court ordered that a new commitment hearing would be held after appointment of new counsel. D.E. 97. The undersigned Mr. Brenner was appointed as counsel for Mr. Blackledge three days later. D.E. 98.

On October 6, 2014, Mr. Blackledge filed a motion to appoint an additional Respondent-selected examiner, Dr. Frank Wood. D.E. 100. The court granted the motion on October 16, 2014. D.E. 104. Dr. Wood's report opined that Mr. Blackledge was not sexually dangerous. D.E. 106.

A discovery scheduling order was filed on July 13, 2015, ordering the case to be ready for hearing after September 15, 2015. D.E. 127. A civil commitment hearing was held on May 17, 2016. D.E. 144. On November 16, 2016, the court announced its decision to commit Mr. Blackledge as a sexually dangerous person under the Adam Walsh Act, and a corresponding order was filed on the same date. D.E. 149, J.A. 712. Mr. Blackledge filed a timely Notice of Appeal on December 15, 2016. D.E. 151.

***Statement of Facts***

Thomas Blackledge has spent roughly half of his 72 years in prison. J.A. 718-33. Since the expiration of his criminal sentence, in September 2009, his confinement has been of an indeterminate status as his case has proceeded through the courts to resolve whether he is to be civilly committed. During that time, he has committed no sexual offense, no disciplinary infraction of any kind. J.A. 897, 847. During that time, he has weighed the misdeeds of his past and charted life-affirming plans for his future, a future in which he is able to marry the woman who loves him. J.A. 50-54.

During that time, as a relentless function *of* time, he has aged. "My fires are burning low, and they're staying that way," he reported in 2014, and repeated at the hearing. "[M]y fires burn low because my body is out of gas." J.A. 925, 56. Being over 70, he is beyond the age at which any statistically significant likelihood of re-offending has been found to exist, and he is determined "to stay clean." J.A. 918, 929-30, 67. One insight that he has gained is that he must do everything necessary to avoid reoffending; this attitude has been noted as evidence of a "continued improvement in self-understanding of the requirements for refraining." J.A. 926, 928.

Mr. Blackledge candidly admits that he still has a "passion for sex." J.A. 57. He still experiences sexual fantasies, but the young women who animate those

fantasies are drawn largely from memory. J.A. 38-40. "My body is kind of gone" now, he said. "It doesn't dominate my life." J.A. 57. He has come to understand that the sexual offenses he committed against children were wrong; "he has realized that the victims are despised by society almost as much as the perpetrators are." J.A. 926, 62-63. As to how much perpetrators are despised, he has personal knowledge. By the mid-2000s, thanks to the internet, his fellow inmates were aware of his history as a sex offender, and their hostility was palpable; "the gangs did research and kicked me off the compound." These painful memories underscore his determination never to find himself in prison again. J.A. 60-61, 926.

The adopted child of poor parents, Mr. Blackledge grew up "a little cow town in northern Wyoming." J.A. 496. His adoption was their second attempt; the first baby, a girl, died prior to placement. J.A. 497. His mother would call him "Junie," a nickname that referred to the lost child; she would sew girl's clothing that she had him model for other women. All of this was humiliating, causing him at one point to retaliate by dropping his pants. J.A. 819. He believes these experiences marked the beginning of his confusion about sexuality. He believes his mother experienced early onset dementia. He describes his father as cold and distant, "abusive verbally and psychologically" to him and his mother. He recalls his isolation from his father as traumatic. J.A. 882, 819, 825, 497-99.

Beginning at age 10, he suffered five years physical abuse from a neighborhood bully. J.A. 500-01. At age 12 he learned accidentally that he was adopted, which "just blew my sense of self away." J.A. 501-03, 819. His parents promised to talk it through with him but never did. J.A. 508-09. Reflecting on their silence, he said both "it's easier than being angry" and "it's also easier to be angry." J.A. 509, 510. Despite his confusion, the adoption issue was not resolved in any way that would have cemented a loving relationship.

In 1960 he was convicted of first-degree murder. He was 15 years old, and so was his victim, a neighboring girl who had rebuffed his sexual advances. Sentenced initially as an adult to an indefinite term in the Wyoming State Penitentiary, he was resentenced four times. J.A. 724. He described his eight years in prison as both "an excellent growth period" and "a struggle." J.A. 532. He took advantage of self-education and rehabilitation programs, graduating as valedictorian from the local high school in 1964. J.A. 533, 820. Upon his parole in 1968, at age 23, he enrolled in a junior college, advancing to the University of Northern Colorado with a scholarship. J.A. 534, 820. While attending college, from which he graduated with a degree in psychology and vocational rehabilitation, he got married. J.A. 534-38, 547. But the marriage was troubled. J.A. 541-43, 821. The couple had one child, and after about five years they separated, with the mother obtaining custody. J.A. 545-46.

7

Finding a job after college was made difficult when the vocational rehab positions that Mr. Blackledge thought he was training for began to require master's degrees. J.A. 547-48. One job he did secure was with an organization working with delinquent children and their parents. J.A. 549. But after about two years he left, and began to quality for social security disability, because an addiction to drugs had destroyed his health. He was experiencing chronic panic attacks. These lasted for seven years. It was during this time period that he began to feel sexually attracted to children; but other activities, such as playing in a band, kept him from acting on those urges. J.A. 550-56, 888.

In 1986, he was convicted in federal court in Colorado of mailing child pornography and using children to create pornography and sentenced to 12 years in prison and five years of supervised release. J.A. 822. He was also convicted in state court on various counts of sexual exploitation of children, with the sentencing concurrent with the federal convictions. J.A. 891. He was confined to federal prison from July 1986 to August 1993, then transferred to the Colorado system to serve the remainder of his 20-year state sentence. J.A. 892. There he completed several years of sex offender treatment. J.A. 892, 644-45. He was paroled in February 2003. J.A. 811.

Once on parole, he bought a personal computer, which he initially used to look for employment; but in time he began to explore forbidden internet sites. J.A.

8

593-95, 893. This being his first experience with a modern-day computer, it seemed to him that the pornographic images "leaped out" from the screen. It "frightened" him "at the same time as it aroused" him. "I said, I'm toast . . . you might as well go ahead and have all the fun you want because you're doing down." J.A. 596. And yet the next thing he did was to turn himself in; he reported his violation to his therapist. J.A. 596, 893-94.

In March 2004, about 12,000 photos were identified on Mr. Blackledge's computers, of which 17 depicted nude minors in poses that were "sexually exploitive" under Colorado law. J.A. 816, 895. The federal probation officer then learned that he had exchanged nude pictures with five teenage girls via the internet. J.A. 816.

In February 2005, he was convicted of one count of sexual exploitation of children-possession of pornography-second offense in Colorado state court. J.A. 816. In April 2005, he was convicted of two federal probation violations and sentenced to six years in federal prison, and in May 2005, he was returned to state court where he was sentenced to six years, to run concurrently with the six-year federal term. J.A. 816. He was scheduled to be released from custody in September 2009, J.A. 818; but he was transferred to Butner, J.A. 843, and his release was placed on hold when he was identified for commitment precertification.

While confined during this liminal period, Mr. Blackledge has presented no behavioral problems. J.A. 897, 847. He continues to struggle with anxiety and

depression. J.A. 695-06, 698. Although sex offender treatment is available to him, he has chosen not to participate in it, because he believes the attitudes of other sex offenders in the program would "pull [him] down." J.A. 632-34. He believes that individual counseling would be more beneficial, and he hopes to work with a private therapist when he is released. J.A. 634-35.

Mr. Blackledge has other hopes for a life beyond prison walls. He imagines a quiet, solitary life tending a greenhouse and pursuing interests in pottery and looming--activities that he recognizes to be able to keep him "safe." J.A. 654-55, 601-03. More than this, he looks forward to marriage to a woman who accepts him for who he is. Wendy Dial, a Trinidadian who has worked for several decades for British Airways, has said what keeps her loyal to him is his "honesty," he observes. "My forthrightness. . . . That's the way I have to be." What he anticipates with her is "an old-folks relationship. Lots of good conversation. . . . And companionship, good companionship." J.A. 671. Ms. Dial has been diagnosed with terminal cancer. J.A. 670.

Mr. Blackledge will be 73 years old in October. J.A. 718. This is not a case in which a person is seeking release from civil commitment under the Adam Walsh Act, after having been committed some time in the past. The government is here seeking to secure the *initial* commitment of a man who is well into his 70s.

## SUMMARY OF ARGUMENT

In seeking to commit a person under the Adam Walsh Act's civil commitment provisions, the government must surmount a high burden. It must prove, by clear and convincing evidence, that the person would have "serious difficulty" in refraining from committing further acts of sexual violence or child molestation if released. 18 U.S.C. §§ 4248(d), 4247(a). "Serious difficulty" refers to the degree to which the person "suffer[s] from a volitional impairment rendering them dangerous beyond their control." *United States v. Antone*, 742 F.3d 151, 159 (4th Cir. 2014).

Thomas Blackledge was 71 at the time of his commitment hearing, which came seven years after the expiration of his criminal sentence. He has committed no sexually related disciplinary incidents while in federal custody and none at all in the years since he was precertified for commitment.

In deciding in favor of the government, the lower court gave great weight to the subjective clinical judgment of the government's expert witnesses while dismissing empirical evidence supporting the proposition that it is virtually impossible to assert that any risk of recidivism exists for persons over age 70. This was clear error. As a matter of law, the commitment should be reversed.

Mr. Blackledge's past is marked by the commission of very serious sexual crimes, including the murder of a 15-year-old girl. Much of the government's

11

testimony rehearsed his troubled past. Government witnesses and the court appeared especially concerned that Mr. Blackledge's current motivation to "stay clean" came from a pragmatic fear of being returned to prison, rather than a moral resolve.

Certainly, a person's past behavior and persistent attitudes bear some relevance to the question of predicting future patterns. *United States v. Wooden*, 693 F.3d 440, 458 (4th Cir. 2012). But the law "forsakes" a "myopic focus on the past"; an over-reliance on a person's history risks shifting the burden of proof to the offender. *United States v. Cook*, 565 Fed. Appx. 193, 200 (4th Cir. 2014) (per curiam) (Davis, S.C.J., concurring). And a perceived lack of criminal remorse is not the proper foundation for civil commitment under the Adam Walsh Act.

The purpose of the Act is to protect the public from the release of persons who remain at risk of sexually reoffending. Because his commitment does not conform to the statute's purpose but only serves to extend his punishment, Mr. Blackledge's commitment violates the constitution's ban on ex post facto laws. For this additional reason, it must be overturned.

This Court should reverse the commitment and return the case to the trial court for the formulation of a release plan appropriate to his needs.

# ARGUMENT

### *Standard of Review*

In this appeal from a civil bench trial, factual findings are to be reviewed for clear error, legal questions de novo, and mixed questions of law and fact de novo. *Qinetiq US Holdings, Inc. v. Commissioner of Internal Revenue*, 845 F.3d 555 (4th Cir. 2017). Under the clear error standard, reversal is appropriate "if the district court failed to 'properly tak[e] into account substantial evidence to the contrary' or its 'factual findings are against the clear weight of the evidence considered as a whole.'" *United States v. Antone*, 742 F.3d 151, 165 (4th Cir. 2014), quoting *United States v. Wooden*, 693 F.3d 440, 462 (4th Cir. 2012). If the appellate court is "'left with the definite and firm conviction that a mistake has been committed,'" the court should reverse. *Antone*, 742 F.2d at 165, quoting *Wooden*, 693 F.3d at 451.

A constitutional claim raised for the first time on appeal is to be considered under the "plain error" standard; that is, review is appropriate for errors that are plainly apparent and affect substantial rights. *United States v. Olano*, 507 U.S. 725, 731-32 (1993); *United States v. Ramirez-Castillo*, 748 F.3d 205 (4th Cir. 2014).

**I.    THE GOVERNMENT FAILED TO ESTABLISH THAT MR. BLACKLEDGE WOULD HAVE "SERIOUS DIFFICULTY" IN REFRAINING FROM SEXUALLY VIOLENT CONDUCT OR CHILD MOLESTATION, AND THUS THE COMMITMENT SHOULD BE OVERTURNED.**

To confine a person to civil commitment under the Adam Walsh Act, the Government must provide that the person (1) has engaged in or attempted to engage in sexually violent conduct or child molestation; (2) currently suffers from a serious mental illness, abnormality, or disorder; as a result of which the person (3) would have serious difficulty in refraining from sexually violent conduct or child molestation if released. 18 U.S.C. §§ 4248(d), 4247(a).

"Serious difficulty" refers to the degree of "volitional impairment, which impacts the person's ability to refrain from acting upon his deviant sexual interests." *United States v. Hall*, 664 F.3d 456, 463 (4th Cir. 2012). This prong of the test is "more complicated" than the first two "in that it requires the court to issue a predictive judgment" about how a person will behave "in the uncertain future." *United States v. Antone*, 742 F.3d 151, 159 (4th Cir. 2014). It is a delimiting question, to be resolved only against "those who suffer from a volitional impairment rendering them dangerous beyond their control." *United States v. Francis*, 686 F.3d 265, 275 (4th Cir. 2012).

Moreover, the requirement of a volitional impairment "is of 'constitutional importance' because it works to 'distinguish[] a dangerous sexual offender

14

subject to civil commitment from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings.'" This distinction is critical "'lest civil commitment become a mechanism for retribution or general deterrence--functions properly those of criminal law, not civil commitment.'" *United States v. Wooden*, 693 F.3d at 443, quoting *Kansas v. Crane*, 534 U.S. 407, 412 (citation omitted).

The proof must be by clear and convincing evidence. § 4248(d). This is evidence

> of such weight that it produces in the mind of the trier of fact a firm belief or conviction, *without hesitancy*, as to the truth of the allegations sought to be established, and, as well, as evidence that proves the facts at issue to be *highly probable*."

*United States v. Springer*, 2012 WL 3957857 (E.D.N.C. 2012), *aff'd*, 715 F.3d 535 (4th Cir. 2013) (citations omitted) (emphases added). This exacting standard also bears Constitutional implications, because "[t]he individual's liberty interest . . . is of such weight and clarity." *Addington v. Texas*, 441 U.S. 418, 427 (1979).

The government presented two witnesses at trial: Christopher North, Ph.D., psychologist, and Gary Zinik, Ph.D., clinical forensic psychologist. The court cited their testimony as well as a 2015 report prepared by Tanya Cunic, Psy.D., a clinical psychologist employed by the Bureau of Corrections. Mr. Blackledge testified on his own behalf, and his expert witness was Frank B. Wood, Ph.D., a neuropsychologist.

Mr. Blackledge does not challenge the court's finding on Prong One. He does not challenge the court's conclusion that Prong Two was substantially met. Indeed, he stipulated to both. D.E. 141. But he strenuously contests the court's finding on Prong Three, because it fails to acknowledge the demonstrated impossibility of assigning any empirical risk factor to a person over age 70. Even in the particulars of its finding on the uncontested Prong Two, the court's erroneous weighing of the evidence before it had an improper impact on its conclusion as to Mr. Blackledge's ability to maintain volitional control. Additionally, and relatedly, the court erred in giving excessive weight to Mr. Blackledge's criminal past while disregarding supportive evidence of his present mental condition.

For the reasons further argued below, this Court should find that the district court accorded improper weight to the government's witnesses while minimizing or ignoring substantial conflicting evidence in Mr. Blackledge's favor, and thus committed clear error. This Court should reverse the commitment decision and remand the case for the formalization of an appropriate release plan.

A.    In finding that Mr. Blackledge lacks volitional control, the court credited unsubstantiated opinion over scientific consensus.

Expert testimony focused primarily on the widely used Static-99R sex offender risk assessment instrument, a revision of the Static-99 that, to an extent, factors in age. But as detailed below, the rate of reoffense established for persons released at age 70 or older is statistically insignificant; and Mr. Blackledge was 71

16

on the date of the hearing. J.A. 36. The court erred in crediting subjective "clinical judgment" with greater weight than this uncontradicted empirical evidence.

       1.      <u>The court's opinion evidences no acknowledgment or deliberation of Dr. Wood's testimony on the utter lack of evidence available on recidivation rates after age 70.</u>

As detailed by Dr. Wood, the actuarial instruments most commonly used to assess the risk of reoffending among adult male sexual offenders make it virtually impossible to predict that any risk of recidivism exists for persons age 70 or over. As he elaborated in his report of 2014 (and testified to the same effect),

> The one overwhelmingly significant factor in Mr. Blackledge's case is age: he is 70. That act alone vitiates any of the actuarial paradigms (the prime but by no means only example being the Static-99R). To be sure, the Static-99R has an age correction, but it doesn't adequately describe the prediction of sexual recidivism for inmate[s] who are 70 or over. Helmus, et al. (2012), major architects of the Static-99R, were clear on this point:

> > Of their more than 4000 cases of sexual offending, only 79 cases were age 70 or over. Of these 79 cases, only 3 recidivated within the five year follow, for a recidivism prevalence of less than 4.17 percent within the 70+ age group (4.17 percent being the rate for their validation sample). Anyone 70 years of age or older is at quite low risk for recidivism, whether calculated from regression formulas or from empirical prevalence data.

> > As Wollert (2006) noted, *such low base rates of the predicted outcome make a calculated prediction essentially impossible: In these situations it is far more accurate simply to predict no recidivism for anyone who is 70 or over.*

J.A. 929-30 (emphasis added), 919, 132.

17

While static risk factor assessments are generally more reliable than dynamic ones, according to Dr. Wood, J.A. 147, neither is of predictive value for persons over 70. "[T]his is an area that needs further research," he said. "We don't have the science yet that allows us to make predictions for this group."[1] J.A. 133. "We're not at a stage where we can prove that an individual, who is over 70 years old, [has] a certain amount of risk, all factors taken into consideration. All we know is that few of them show an inability to refrain from sexual re-offending." J.A. 136. An expert might use his clinical judgment to inform an opinion, Dr. Wood continued, but such an opinion--even his own--"should be taken as inferior to evidence--that is to say, inferior to the fact that there is a lack of evidence." J.A. 149.

Dr. North was aware that the creators of the Static-99R have concluded that persons over 70 have a very low recidivism rate; "everyone's pretty consistent" on that fact, he agreed. J.A. 90-91, 94. He acknowledged its use is disfavored with such persons and conceded that the Static-99R would overestimate Mr. Blackledge's risk. J.A. 91, 95. And yet he did rely on this instrument in concluding that Mr. Blackledge met Prong Three. J.A. 91.

---

[1] Dr. Wood's opinion extended to all of the static instruments relied upon by government witnesses. He found that one of them, the SRA-FV (Structured Risk Assessment-Forensic Version), was removed in 2013 or 2014 from the list of instruments approved by the State of California. J.A. 147-48.

Dr. Cunic--who again did not testify, but upon whose 2015 report the court relied--also acknowledged that "Mr. Blackledge has reached an age which is often considered a protective factor"; but, other than noting that he last offended at age 59, her report does not elaborate on why age did not figure into her conclusion that he was "highly likely" to reoffend. J.A. 880. The court's reliance on Dr. Cunic's 2015 report, moreover, is inherently flawed. Her conclusion on the age factor implausibly recognizes no change over time, even though her first report on him was in 2009.

Three reports of hers are found in the record: the 2015 report that the court cited, J.A. 694-95; a forensic report from 2011; and her 2009 precertification report. J.A. 871ff., 784ff., 794ff. None of her findings were based on substantive personal interview (*see* note 4 *infra*), and she conceded that "[t]here are inherent limitations when completing evaluations on record review alone." J.A. 872. In her initial 2009 report, when Mr. Barrett was 64, she writes:

> In addition to exacerbating risk factors, mitigating or protective factors were also considered. Typically, completion of sex offender treatment is considered a protective factor, however completion, in and of itself, is not a protective factor. Sex offender treatment completion should be viewed in the context of treatment benefit or using the skills taught to prevent recidivism. In this respondent's case, he clearly did not use the relapse prevention skills learned for any length of time; he re-offended within six months post-incarceration. It seems whatever benefit received from programming was insufficient to reduce his risk of sexually re-offending. This assessment is supported by the degree of psychopathology as assessed in the 2004 evaluation. *Finally, there is some research to suggest that those over the age of 60 have lower rates of reoffense. Given that the inmate*

19

> *reoffended at the age of 59*, it appears unlikely that Mr. Blackledge
> was on a trajectory that supports this assertion. (Emphasis added.)

J.A. 802. This paragraph appears again, essentially verbatim, in her 2011 and 2015

reports. J.A. 792, 880.[2] Taken together, Dr. Cunic's opinions offer a troubling

illustration of a failure to seriously consider the impact of the passage of time.

Dr. Zinik concurred that "older offenders re-offend very rarely." J.A. 110. In

testimony that aligned with Dr. Wood's citation to the study that resulted in a less

than 4.17 percent recidivism rate, he said, "[I]f we wanted to be right most of the

time, we should release 70-year-old sex offenders because, just based on the

research and probabilities, we would be correct probably 96, 97 percent of the

time." *Id*. But "even though it's a very rare event," he continued, "it does occur."

Mr. Blackledge, in his opinion, is one of the "rare birds" that could re-offend. J.A.

111. He is an "outlier." J.A. 117.

As to dynamic risk factors, Dr. Wood cautioned that they "are not well

developed, . . . certainly not quantified" for use with a person over 70. J.A. 134.

And yet the government experts used their subjective assessment of dynamic risk

factors to attempt to overcome the problem posed by Mr. Blackledge's age. Dr.

North, for example, relied on historical factors--including a prior admission of

being a "sexual scavenger" and his resentment of his probation officer's authority--

---

[2] In the 2015 report, "in the 2004 evaluation" becomes "in prior evaluations."

20

as well as Mr. Blackledge's current (as of 2014) attitudes on such topics as masturbation and fantasy (while noting, nonetheless, Mr. Blackledge's belief that masturbation and fantasy would lessen his likelihood of reoffense). J.A. 701-02.

Dr. Cunic's identification of dynamic risk factors also relied on history, in particular Mr. Blackledge's failure to abide by conditions of supervised release and his then-possession of child pornography; as well as a generalized sense about his "attitudes that justify or rationalize his history of sexual contact with children." J.A. 703. A comparative review of her reports in full, however, reveals much repetition (as suggested above), raising at least a question as to the level of care that went into her analysis even of these factors.

Dr. Zinik similarly relied upon the historical factors of "lifestyle impulsiveness" plus general notions of "sexual preoccupation" and "attitudes toward supporting sexual offending, poor problem solving, and poor cooperation with rules and supervision" (the latter of which presumably referred to his parole violation, for no such recent problems were in evidence). J.A. 704-05.

Dr. Wood's conclusion that Prong Three was not met relied on judgments reached after interviewing Mr. Blackledge as well as studying his record (as discussed further below), but he cautioned that even his own opinion should be taken cautiously in the face of the sheer lack of evidence:

21

> I think my professional judgment, opinion about people of his age and circumstance is not scientifically solid. I don't think it's solidly defensible for me to insist that he is unable to refrain. I also think it's scientifically indefensible to say with any confidence that we know that he is likely to re-offend and that he has not got the ability to refrain.

J.A. 140-41. As to the claim that he is an "outlier,"

> [Y]ou can't predict an outlier if he's an outlier. Outliers are people who defy prediction, who don't fit the mold.

J.A. 141.

Accordingly, there can be "no scientific justification" for predicting a likelihood of recidivism after age 70. J.A. 141. "[T]he literature just echoes in every one of its corners with the statement that the thing you can least rely on is clinical judgment. You need evidence." J.A. 151. *Cf. Young v. State of Washington*, 86 F.3d 810 (Wash. App. 2004) (where witness testified that "the actuarial tables distort risk assessments for older offenders because they do not adequately account for the aging process," his opinion "could convince a rational trier of fact that he is no longer more likely than not to engage in predatory acts of sexual violence"). *See also United States v. Carter*, 669 F.3d 411, 418-19 (2012) (remand where "government has chosen not to rely on academic research or other empirical data," but rather argued "common sense").

The clear error committed was not that the court gave some consideration to the clinical judgments of the government witnesses, or even that it misjudged their

credibility. It is that it did not--and rationally could not--explain why it found their conclusions persuasive, in the face of scientifically validated, indeed uncontradicted, testimony that there is no empirical evidence to justify predicting that a person over age 70 is at risk of sexually reoffending.

In justifying its result, the court relies heavily on *United States v. Wooden*, 693 F.3d 440 (4th Cir. 2012), in which this Court overturned a finding in favor of a detainee in an Adam Walsh Act § 4248 case, apparently suggesting that the government similarly should prevail here. But that reliance is misplaced.

What *Wooden* stands for is the proposition that the trial judge is obligated to take into account the totality of the evidence: "the court [is] required to at least consider the evidence, and account for it, when concluding otherwise." 693 F.3d at 454. The lower court is obligated to "'explain[] and reconcile[] seemingly inconsistent parts of the record,'" because doing so "'lays bare the judicial thinking process, enabling a reviewing court to judge the rationality of the fact-finder's reasoning. . . . [F]ailure to take into account and reconcile key parts of the record casts doubts on the process by which the finding was reached, and hence the correctness of the finding.'" *Id*. (citation omitted). Engaging in this kind of searching analysis, reconciling opposing opinions, is precisely what the court did not do.

The trial court repeatedly states that it finds the testimony of government experts "persuasive." J.A. 702, 705, 708. But calling it persuasive does not make it so. Merely to "repeatedly explain[] in its opinion that it finds [certain] testimony more credible" than other testimony is not sufficient. *Wooden*, 693 F.3d at 453-54. The court is obligated to "consider the evidence as a whole using the framework provided in the [Adam Walsh] Act." *United States v. Francis*, 686 F.3d 265, 276 (4th Cir. 2012). The court gave no explanation for why it credited the subjective clinical judgments of the government's experts over the only scientific evidence properly before it. To announce a conclusion without accounting for substantial evidence to the contrary is to invite a finding of clear error.

> 2. <u>The only purportedly scientific evidence that the court relied upon was a study not admitted into evidence and of no probative value</u>.

Important to the court's decision on Prong Three was a 1997 British study of elderly sex offenders. Interpreting the study, the court said,

> Some common attributes of the study group of sex offenders age 65 to 89 included evidence of a lifelong attraction towards and sexual contact with children, spanning more than 20 years, and involving up to four victims. The study's authors hypothesize that such sex offenders have a long-standing Achilles heel that may actually be prone to re-emerge in old age. J.A. 704-05.

This study--rather, a summary description of this study--provided essential support to the court's conclusion that Mr. Blackledge bore an "Achilles heel" that would render him "prone" to re-offending, even in his old age.

24

The study, however, was not in evidence. It was merely an article that Dr. Zinik relied upon in offering his opinion. Although Dr. Zinik quotes a brief passage from the study in his report, J.A. 909, it was never even offered as evidence. The government did not question him about it upon the witness stand. This study is the closest thing to scientific evidence that the government had available, and yet government counsel carefully positioned the witness so as to avoid being questioned about its inherent flaws.

"Under Fed. R. Evid. 703, hearsay evidence, or other inadmissible evidence, is permitted solely for the limited purpose of explaining the basis of an expert's opinion; however, the inadmissible evidence is *not* proof of the truth of the underlying matter." *Allianz Insurance Co. v. Taylor*, 62 B.R. 846, 853 (Bankr. E.D. Va. 1986) (citation omitted) (emphasis in original). *Allianz* illustrates why this rule is necessary. Where an accountant relied on a particular audit report in the course of forming his opinion, he was barred from testifying as to the accuracy of the report,

> especially in light of the fact that [the witness] had no connection to the preparation of the reports. Moreover, no witness was available for cross-examination by the defendant who either prepared the reports, who could give first hand knowledge of how the reports were prepared, or who would have actual knowledge of the underlying information that was used to formulate the reports. *Id.*

Unless such an item is formally admitted, opposing counsel has no opportunity to challenge its methods or its validity.

25

Had the study been properly before the court, Mr. Blackledge's counsel would have revealed its flaws. "[T]he average age at the commission of the index sex offense was 67.8 years." J.A. 909. But the average age does not tell us how many of the subjects were over 70. More than that, the study does not identify the data pool from which these rare individuals were selected. Possibly some other criteria might have been recognized that would have placed him at greater risk-- such as the commission of repeated violent offenses while incarcerated. Such behavior would indicate a lack of impulse control. But scant evidence of any violent behavior during his criminal confinement exists, and none in the intervening years since his precertification. J.A. 897, 847. Nothing about this 1997 study contradicts or impeaches the proposition that for a person like Mr. Blackledge, recidivation at age 70 or older is so scientifically rare that no one with any confidence can offer the opinion that he is sexually dangerous.

That the government understood the importance of a scientific basis for its position is evident in the fact that its witness cited this study. And yet by not questioning him about it, thus precluding cross-examination, the government tacitly acknowledged the study's weakness.

Similarly, in relying on this study, the court did at least implicitly acknowledge that scientific evidence is essential to answering the question of volitional control. Given its dismissal of Dr. Wood's testimony, this is the only

"science" the court had available. In lifting the study up out of Dr. Zinik's report and using it to buttress its conclusion on Prong Three, the court considered an item not in evidence and thus committed clear error. Had the study been properly before the court, moreover, its utter lack of probative value would have been revealed.

B.    Even the court's particular factfinding on the nature of Mr. Blackledge's mental illness under Prong Two contributed to a clearly erroneous finding on the question of volitional impairment.

Neither side contested the conclusion that Mr. Blackledge met Prong Two-- possession of a serious mental illness, abnormality, or disorder. Mr. Blackledge stipulated to suffering from pedophilia. D.E. 141. And yet even in its findings and conclusions on this element, the court found facts against the weight of the evidence, using them to support its conclusion on Prong Three.

Dr. North offered a diagnosis of "Pedophilic Disorder, sexually attracted to girls, non-exclusive type, possible Alcohol Use Disorder, Persistent Depressive Disorder, and Antisocial Personality Disorder." J.A. 692.

Dr. Cunic diagnosed the following: "Pedophilic Disorder, Sexually Attracted to Both, Panic Disorder, Alcohol Use Disorder, Moderate in a Controlled Environment, and Other Specified Personality Disorder with Antisocial Traits." J.A. 695.

Dr. Zinik gave the following diagnosis: "Pedophilic Disorder, sexually attracted to males and females (with preference for females), possibly exclusive

type, Personality Disorder with Antisocial Features (primary) and Narcissistic

Features (secondary), possible Alcohol Use Disorder, and Persistent Depressive

Disorder." J.A. 696.

"Exclusive type" describes a type of pedophilia experienced by a person

"who has never had adult sexual partners and/or whose sexual interests are focused

entirely on children." That definition comes from Dr. Zinik, who expanded upon

his diagnosis of "possibly exclusive type" to say that he "suspect[s] this [type]

describes Mr. Blackledge.

> His pedophilia may have initially emerged as nonexclusive existing
> side-by-side with normative sexual arousal to adults. But eventually it
> morphed into the exclusive type pedophilia which overpowered his
> desire for adults. At this point there is evidence to suggest that (1) his
> sexual interests are fixated entirely on children, and (2) he cannot get
> aroused without sexual stimulation involving children.

J.A. 902-03; *see also* J.A. 97-101.

Dr. Wood diagnosed Mr. Blackledge with "several serious mental disorders,

including Pedophilic Disorder, Schizotypal Personality Disorder, and Panic

Disorder--the first two of which, according to Dr. Wood, are risk factors." J.A.

698.

Weighing these diagnoses, the court found that Mr. Blackledge suffered

from the serious mental illnesses/disorders of Pedophilic Disorder and Personality

Disorder with Antisocial and/or Narcissistic Features. J.A. 698-99.

Relevant to Prong Three, the court interpreted the opinions of two of the experts in ways that (1) unduly weighed against Mr. Blackledge and (2) failed to give due weight to a diagnosis that bears within it a factor that protects against future risk of re-offense.

(1)    As to Dr. Zinik's diagnosis of "exclusive type," the court failed to acknowledge that he was the only expert to render this opinion. Nonetheless, the court found that "Dr. Zinik's opinion . . . is significant in that exclusive type pedophilia, in his opinion, is more difficult to treat and presents a higher risk of re-offense." J.A. 697. Given this diagnosis was a minority finding, the court accorded it more weight than it objectively deserved.

(2)    The court's failure to note that Dr. Zinik was alone in his "exclusive type" diagnosis contrasts instructively with its treatment of Dr. Wood's testimony. As to Dr. Wood's diagnosis of Schizotypal Disorder, the court *does* remark that he was the only expert to so find, J.A. 708, and consequently minimizes its weight. This conclusion was misguided, if not inaccurate, in that such a diagnosis was on the record. Dr. Blackledge had been diagnosed with Schizotypal Disorder twice in 2014, by a Butner physician, as Drs. Wood, Zinik, and Cunic noted. J.A. 930, 901-02, 874. As

of 2015, Dr. Zinik listed Schizotypal Personality Disorder as a current diagnosis. J.A. 901.[3]

Moreover, to the extent that the court did acknowledge Schizotypal Disorder, it failed to fully consider Dr. Wood's opinion on the matter. Explaining that Mr. Blackledge presented the disorder in its weaker form, Dr. Wood went on to conclude that, paradoxically (as discussed in the following section), it expressed itself in a tendency toward rigid thinking, which constitutes a protective factor against reoffense.

C.  <u>The district court placed undue emphasis on Mr. Blackledge's criminal history, giving too little weight to his present mental condition</u>.

Although "consideration of the nature of [the detainee's] prior crimes provides a critical part of the answer" to the question of volitional control, *Wooden*, 693 F.3d at 458, such consideration must not be the controlling factor. As suggested by the arguments above, the lower court gave undue weight to Mr. Blackledge's past, ignoring substantial evidence of his present condition and his affirmative prospects for the future.

---

[3] Mr. Blackledge had complained, as recently as May 2014, of a scalp infestation in ways that suggested delusional thoughts: that flies were hatching from his scalp. J.A. 927. Dr. Wood theorized that this type of delusion could be caused by schizotypal personality disorder. J.A. 927, 138-40. In what can only be read as callous disrespect, Dr. Zinik--who had not even met the man--proposed that since "Mr. Blackledge has long hair . . . it is not impossible that bugs could get in that he might mistakenly believe were hatched there." J.A. 901-02.

Almost half of the district court's thirty-two pages of Findings and Conclusions are devoted to Mr. Blackledge's criminal history--a lengthy recital offered to support a finding that was uncontested (Prong One). The three government experts similarly stressed Mr. Blackledge's past. Dr. Wood offered the most detailed and analytical projections about his future behavior, grounded in neuroscientific analysis and conducted after meeting with Mr. Blackledge for eight hours over three different occasions, in 2014. J.A. 919. He was the only expert to comment on the evolution of Mr. Blackledge's thought processes over time.

For example, comparing his 2011 deposition statement on what would make it easier for him to refrain from reoffending with the 2014 interviews, Dr. Wood noted a consistency in his assertion that offending is "no longer worth it" because of potential punishment (rather than moral wrongness), but added that he had seen Mr. Blackledge's thinking evolve:

> His sense of the wrongfulness of child sexual activity now includes his realization that he has realized that victims are despised by society almost as much as the perpetrators are.
>
>> *Interpretive note*. This description is both creative and suggestive of an intellectual conclusion to a sequential thought process. It could be suggestive of a more intellectual than emotional perspective on the issue.

J.A. 926.

Further, Dr. Wood gave a nuanced interpretation of Mr. Blackledge's accidental downloading of child pornography while on probation. Whereas it

31

suggests initially "at best--a careless approach, . . . [w]hat saves it from being adverse to his prospects for restraining is the [later] self-report of needing to be 'rigid' in avoiding any situation that could lead to being tempted, including internet pornography, lest severe legal retribution ensue." J.A. 926-27.

The need to be "rigid" is an evolution from his 2011 deposition, Dr. Wood observes, where Mr. Blackledge recalled saying to himself, "You might as well go ahead and have all the fun you want because you're going down." In Dr. Wood's view, the new commitment to strict abstinence is a "practical" stance, "not related to motives, promises, or resolutions. As a general psychological principle, successful abstention from anything is better promoted by a realistic appraisal of the consequences of offending than by any reliance on internal will power." J.A. 926.

This self-assessed "rigidity" is consistent with the diagnosis of Schizotypal Personality Disorder and the further ways in which it serves to explain and predict Mr. Blackledge's behavior, in Dr. Wood's opinion.

> Schizotypy has an interesting bivalent impact on Mr Blackledge's risk of reoffending, however: on the one hand it is not only a mild risk factor for sexual offending but a mechanism of unclear or disturbed cognition that would interfere with clear thinking about plans to avoid recidivism. In Mr. Blackledge's case, however, there is no overall significant cognitive impairment or deficit, still less any memory problem. . . .

32

> On the other hand, it is for schizotypes especially that avoidance of social contact comes naturally, as does a life style that leans in the hermit direction. Accordingly, sensitive counseling would help Mr. Blackledge configure a life style that is rewarding to him but avoids social risks of reoffending.

J.A. 930.

Dr. Wood testified that, in its milder form such as Mr. Blackledge presents, Schizotypal Personality Disorder "means a predilection for social withdrawal"; it is a "kind of mental state . . . that would be especially highly motivated by fear of punishment." J.A. 139-40. He also related Mr. Blackledge's current practice of sexual fantasy to this disorder: "The relationship between fantasy and how people live is weak, and in schizotypy particularly so. . . . They think about a lot of strange things, but they don't do anything about them." J.A. 164.

Drs. Zinik and North testified that they considered Mr. Blackledge's admissions of his continued fantasies of sex with children as evidence of a current and future lack of volitional control. J.A. 76, 88, 101. But these assertions were not backed by anything more than assumptions that current fantasies indicate that past behaviors would resurface. These assertions, moreover, fly in the face of the fact that Mr. Blackledge's disciplinary record has been clean for the past nine years, with only minimal, non-sexual incidents prior to that. J.A. 897, 847. In short, such a supposition does not rise to the level of persuasive evidence. "The mere presence of a sexual attraction to minors is insufficient to meet the 'serious difficulty'

prong." *United States v. Maclaren*, 2013 WL 12188327 (E.D.N.C. 2013) (citation omitted). The existence of a current tendency to fantasy does not support an assumption of a lack of volitional control.

Dr. Wood was the only witness to place Mr. Blackledge's propensity to fantasy in the context of his current psychological state. Moreover, because he was the only witness to spend more than a couple of hours in conversation with him, Dr. Wood was the only witness able to remark upon a "sense of life change," or a "pivoting point," in Mr. Blackledge. J.A. 147. Dr. Wood concluded that Mr. Blackledge's experiences from 2011 to 2016 "really put him over, changed him such that he can no longer allow himself and defend himself in doing these sorts of things that he's been doing." J.A. 148.

No other witness made a searching effort to separate Mr. Blackledge's historic behavior from his current thought processes. No other witness took the trouble to engage with Mr. Blackledge in depth enough to consider that his mental state might have evolved at all.[4]

---

[4] Dr. Zinik did not personally interview Mr. Blackledge. J.A. 882. Dr. Cunic recalls having at least attempted to interview him in July 2009, and she was able to spend a small amount of time with him, but she notes that on July 9, 2009, he refused to participate further in the evaluation. J.A. 794-95, 797. Dr. North conducted a video interview, in 2015, an addendum to his second report; it lasted less than two hours. J.A. 864-69.

Similarly, Dr. Wood's opinion that a motivation to behave lawfully out of fear of punishment, as opposed to moral suasion, might, for a valid psychological reason, prove successful long-term against reoffending was not contradicted by other witnesses. And yet the court dismissed Dr. Wood's testimony entirely, without reasoning why. J.A. 708.

Further, the court gave virtually no weight to Mr. Blackledge's testimony, J.A. 706-07, which was entirely consistent with the person Dr. Wood described. He now knows that his illicit behavior was harmful to children: "Not only to the children, but to their parents and family and friends." He has tasted enough of prison. Years of emotional and physical punishment, "being tortured by inmates, sometimes under the direction of correctional officers, has taken its toll." He has expressed his intention to "stay clean," because he does not want to harm anyone and because of a strong desire to avoid another prison experience. J.A. 65-67.

A member of this Court has cautioned that "over-reliance on an offender's pre-incarceration history poses [the] risk" of "shifting the burden to [the] offender to show that he will not offend again." *United States v. Cook*, 565 Fed. Appx. 193, 200 (4th Cir. 2014) (per curiam) (Davis, S.C.J., concurring). "[O]ur case law forsakes this myopic focus on the past, instead highlighting that recent behavior is also a particularly probative data point in these cases." *Id.*, citing *Antone*, 742 F.3d at 166. The totality of the evidence presented at Mr. Blackledge's hearing was not

accurately reflected in the court's deliberations, resulting in the court's emphasis on his history at the expense of his current mental condition. As a result, the court's decision that he met Prong Three constituted clear error.

Dr. Wood recommended that Mr. Blackledge be released to a controlled setting, with conditions that reinforce his decision to strictly avoid contact with children and alcohol, and with continued counseling and medical monitoring. J.A. 920, 159-60. Because of Mr. Blackledge's obvious intelligence, the recommended counseling would be to encourage him to write a book about his "changed life." J.A. 920. He should be in an environment that encourages him to continue on the positive trajectory he has been on since reaching the "turning point" that Dr. Wood identified. J.A. 146-51.

The evidence, when fairly weighed, demonstrates as a matter of law that Mr. Blackledge does not qualify for commitment under 18 U.S.C. § 1848. This Court should reverse and remand the case to the district court with instructions to release Mr. Blackledge with an appropriate conditional release plan.

## II. BECAUSE IT SERVES NO STATUTORY PURPOSE, BUT ONLY EXTENDS HIS PUNISHMENT, MR. BLACKLEDGE'S COMMITMENT VIOLATES THE EX POST FACTO CLAUSE AND SHOULD BE OVERTURNED.

In striking down portions of Michigan's sex offender registration statute, the Sixth Circuit Court recently observed that the Constitution's ban on ex post facto laws, U.S. Const. art. 1, § 9, embodies the founders' belief that retroactive

punishment "was so 'contrary to the great first principles of the social contract [that it could not] be considered a rightful exercise of legislative authority.'" *Does #1-5 v. Snyder*, 834 F.3d 696, 699 (3d Cir. 2016) (citation omitted). This constitutional guarantee has "provided a powerful check" on efforts "to punish socially disfavored persons without prior notice." *Id*.

A statute written with no punitive intent can nonetheless be found to have a punitive effect. That is what the Sixth Circuit concluded with respect to Michigan's registration statute, and that is what this Court should conclude in the case of Mr. Blackledge's commitment.

The basis of this argument is the trial court's refusal, as detailed above, to recognize that the only empirical evidence in the record that speaks to the recidivism rates of sexual offenders over age 70 demonstrates that there is no scientific basis for predicting a likelihood of reoffense. In examining the record to understand the reasoning behind the court's decision to commit Mr. Blackledge in the face of such scant evidence, a troubling theme emerges. The court appears to have been swayed by the government's repeated emphasis on Mr. Blackledge's "amoral sexual philosophy" (Zinik), his failure to show "any real remorse for his crimes" (North), and "his attitudes that justify or rationalize his history of sexual contact with children" (Cunic). J.A. 891, 853-54, 703; *see also* J.A. 830, 831, 837, 911. Indeed, the government applied a moral frame to its argument at trial: "He

37

doesn't believe that sexual contact with children is morally wrong or harmful," said the government attorney in his opening statement. J.A. 33. The court's findings and conclusions reflect this emphasis on Mr. Blackledge's moral shortcomings. Mr. Blackledge "does not sincerely express remorse for his crimes," the court concluded; he "lacks remorse." J.A. 694, 697.

Government witnesses claimed that Mr. Blackledge's unrepentant attitude constituted a risk factor: Dr. Zinik, for instance, called his "amoral sexual philosophy" a "textbook example of attitudes supporting sexual offending, a risk factor associated with increased risk of recidivism." J.A. 891. Yet the record lacks any discussion of how much weight such an attitude should carry. And when the court cited Mr. Blackledge's lack of remorse, it offered no explanation of the relationship of that finding to a risk of reoffending. Further, it bears repeating that Dr. Zinik never interviewed him, nor did Dr. Cunic, and Dr. North conducted only one brief interview. *See* note 4 *supra*. For the most part, these witnesses' reports are citing the conclusions of prior psychologists, going back as far as 1986. J.A. 891, 892, 895, 807, 830, 837.

Fundamentally, however, the salient point is not the lack of evidentiary reliability of these assessments of Mr. Blackledge's attitude. The point is that a lack of criminal remorse is an improper basis for imposing a civil commitment.

Such an emphasis on his past offenses suggests an intent to "to punish [this] socially disfavored person[] without prior notice." *Does #5*, *supra*.

The Supreme Court has articulated a test for determining whether the ex post facto clause has been violated, the elements of which are "'neither exhaustive nor dispositive'" but are "'useful guideposts.'" *Smith v. Doe*, 538 U.S. 84, 97 (2003) (citations omitted). Under this test, as applied in *Does #5*, 834 F.3d at 701-06, Mr. Blackledge's commitment is punitive.

(1) Does the law inflict what has been regarded in our history and traditions as punishment?

Yes. Adam Walsh Act committees are confined to a federal prison.

(2) Does it impose an affirmative disability or restraint?

Yes.

(3) Does the law inflict what has been regarded in our history and traditions as punishment?

Not on its face. The Supreme Court has held that the civil commitment provisions of the Adam Walsh Act do not violate the Constitution's ban on ex post facto lawmaking. *Kansas v. Hendricks*, 521 U.S. 346 (1997).

(4) Does it have a rational connection to a non-punitive purpose?

Not in this case, and this factor is "'a "[m]ost significant" factor in [a] determination that the statute's effects are not punitive.'" *Does #5*, 834 F.3d at 704, quoting *Smith*, 538 U.S. at 102 (further citation omitted). As applied to Mr. Barrett,

39

the law has no rational connection to a non-punitive purpose. The purpose of the Adam Walsh Act's civil commitment scheme is to keep the public safe. 18 U.S.C. § 4248. When the empirical evidence points to a less than a 4.17 percent chance that Mr. Blackledge will recidivate, and when a government witness agrees that "if we wanted to be right most of the time, we should release 70-year-old sex offenders because, just based on the research and probabilities, we would be correct probably 96, 97 percent of the time," J.A. 918, 110, the logical conclusion is that the court was swayed by the government's emphasis on his criminal history and his perceived moral failings--not by a belief that his release would endanger the public.

(5) Is it excessive with respect to this purpose?

Yes. If the government prevails in this § 4248 proceeding, Mr. Blackledge will be subject to commitment *for the first time* at the age of 72 (or greater). He will likely live out the rest of his life behind prison walls. Rather than being granted the freedom he is due, given the minimal public danger he poses in his old age, he will be confined, "brand[ed] . . .as a moral leper solely on the basis of [his] prior conviction[s]." *Does #5*, 834 F.3d at 705.

Sex offenders are "widely feared and disdained by the general public," as the Sixth Circuit observes. This unfortunate truth, that court goes on to say, "implicates the core counter-majoritarian principle embodied in the Ex Post Facto

clause. As the founders rightly perceived, as dangerous as it may be not to punish someone, it is far more dangerous to permit the government under guise of civil regulation to punish people without prior notice." *Does #5*, 834 F.3d at 705-06.

A civil commitment hearing under the Adam Walsh Act must not tread into the waters of criminal law. Because Mr. Blackledge's commitment bears no rational relation to a non-punitive purpose, and it is excessive to the statute's stated purpose, the effect of the law as applied to him violates the constitutional ban on ex post facto laws.

The impact upon him is plain and substantial. Following the reasoning that this Court applied in *United States v. Ramirez-Castillo*, 748 F.3d 205 (4th Cir. 2014), the Court should consider this constitutional argument and find in Mr. Blackledge's favor. In that case, the appellant had been deprived of his right to a jury verdict of guilt beyond a reasonable doubt. In this case, Mr. Blackledge's personal liberty is at stake. Because the violation of the ex post facto law affects such a substantial right, the decision should be reversed. It should be remanded to the district court with instructions to release Mr. Blackledge with an appropriate conditional release plan.

41

## CONCLUSION

The the line between civil commitment and criminal punishment must be vigilantly monitored, warns Justice Kennedy in a thoughtful concurrence in *Kansas v. Hendricks*. "[T]he practical effect" of a civil commitment law "may be to impose commitment for life," he observes, noting that in the minds of some, such an outcome would only right. 521 U.S. at 372 (Kennedy, J., concurring). But "[t]he point, he continues,

> is not how long Hendricks and others like him should serve a criminal sentence. With his criminal record, after all, a life term may well have been the only sentence appropriate to protect society and vindicate the wrong. The concern instead is whether it is the criminal system or the civil system which should make the decision in the first place. *If the civil system is used simply to impose punishment after the State makes an improvident plea bargain on the criminal side, then it is not performing its proper function*. . . . We should bear in mind that while incapacitation is a goal common to both the criminal and civil systems of confinement, *retribution and general deterrence are reserved for the criminal system alone*. (Emphases added.)

521 U.S. at 371-73.

This Court has recently emphasized that the Adam Walsh Act is not designed to extend the law's punishment for past crimes. "There is '[n]othing on the face of the statute [that] suggests that [Congress] sought to create anything other than a civil commitment scheme designed to protect the public from [a present threat of] harm.'" *Matherly v. Andrews*, 817 F.3d 115, 119 (4th Cir. 2016), quoting *Hendricks*, 521 U.S. at 361.

42

Dr. Wood's testimony demonstrates the futility of applying *any* actuarial risk assessment to Mr. Blackledge's likelihood of re-offending. No government witness even made the argument that meaningful actuarial studies for this age group exist. The best they were able to offer was subjective clinical judgment about an "uncertain future." *Antone*, 742 F.3d at 159. Unless this Court acknowledges the paucity of empirical evidence suggesting that a sex offender over age 70 has any significant likelihood of recidivating, the practical effect for Mr. Blackledge, as well as for others who remain confined under the Adam Walsh Act at his age, may well be "to impose commitment for life."

Further, none of the government witnesses seriously attempted to understand Mr. Blackledge's current mental state. Their overreliance on his criminal history led the court to weigh Mr. Blackledge's past far out of proportion--seeking, in effect, to extend his criminal punishment. This was clear error.

The government bore the burden of proving Mr. Blackledge's current sexual dangerousness--that he would have "serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6). The Supreme Court has said that, while this language does not mean a complete lack of control, it does require that it must be very difficult for the person to control his behavior. *See Kansas v. Crane*, 534 U.S. at 411 (2002) (citing *Kansas v. Hendricks*, 521 U.S. at 358 (1997)).

The government was required to prove that Mr. Blackledge meets this "serious difficulty" test, itself a high standard, by clear and convincing evidence--a substantial bar, reflecting the gravity of the liberty interest at stake. *Cf. Illinois v. Coan*, 57 N.E.3d 1282, 1290 (Ill. App. 2016) (where witness testified that because actuarial assessments are "normed" on persons 17-70, and detainee was 74, it was "inappropriate to apply any actuarial risk assessment to attempt to determine his risk of reoffending"; new trial ordered because jury may have been misled into applying lower than "clear and convincing" standard). The evidence against Mr. Blackledge falls far short of "clear and convincing."

"When 'the court's account of the evidence is not plausible in light of the record viewed in its entirety,' then it is not entitled to deference." *United States v. Antone*, 742 F.3d at 169 (4th Cir. 2014), quoting *Wooden*, 693 F.3d at 460. In *Antone*, this Court overturned a § 4248 commitment. *Antone* serves as useful precedent, but not primarily for that reason. Like *Wooden*, it stands for the proposition that the court cannot summarily dismiss or ignore conflicting evidence. Rather, the court must "weigh the evidence and ask whether the totality of the record 'produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established.'" *Antone*, 742 F.3d at 159.

In *Antone*, this Court found that the best that could be said was that the evidence lay "in equipoise, or at most, rising to a level of preponderance in favor of commitment." 742 F.3d at 159-60. In this case, the evidence cannot fairly be read as even that close. When even the government's own experts concede that it is impossible to assign any meaningful actuarial risk assessment to attempt to predict whether a person over age 70 will reoffend, no rational factfinder could find, by clear and convincing evidence, that Mr. Blackledge poses a likelihood of reoffending.

The effect of committing Mr. Blackledge when his commitment bears no rational connection to a non-punitive purpose, far in excess of the civil purpose of the statute, is to contravene the constitutional ban on ex post facto laws.

Mr. Blackledge has paid for his criminal acts. He has been confined to Butner for eight years, awaiting an answer to the question of whether he should be civilly committed under the Adam Walsh Act. During that time, he has aged. He has crossed the threshold beyond which there is any empirical evidence that he would pose a danger to the public if released. He is ready to begin a new life. Committing him now is tantamount to handing him a life sentence. This Court should reverse the commitment decision and remand the case for the creation of a release plan consistent with Dr. Wood's advice.

## REQUEST FOR ORAL ARGUMENT

Because this case raises vital statutory and constitutional arguments regarding the civil commitment of persons over age 70 under the Adam Walsh Act, with important implications for future litigation under the Act, Mr. Barrett believes that oral argument would be useful. Accordingly, he requests oral argument.

Respectfully submitted this 8th day of May, 2017.

LAWRENCE H. BRENNER
Brenner & Brenner

/s/ Lawrence H. Brenner
Lawrence H. Brenner
P. O. Box 787
Carrboro, NC 27510
(252) 349-0662

/s/ Sarah L. Greene
Sarah L. Greene
Brenner & Brenner
P.O. Box 787
Carrboro, NC 27510
(919) 260-4077

*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

1.    This document complies with type-volume limits because, excluding the

parts of the document exempted by Fed. R. App. P. 32(f) (cover page,

disclosure statement, table of contents, table of citations, statement regarding

oral argument, signature block, certificates of counsel, addendum,

attachments):

this document contains <u>10,647</u> words.

2.    This document complies with the typeface requirements because:

This document has been prepared in a proportional spaced typeface

using <u>Microsoft Word</u> in <u>14 point Times New Roman</u>.

Dated:  May 8, 2017                LAWRENCE H. BRENNER
                                   Brenner & Brenner

                                   <u>/s/ Lawrence H. Brenner</u>
                                   Lawrence H. Brenner
                                   P. O. Box 787
                                   Carrboro, NC 27510
                                   (252) 349-0662

                                   <u>/s/ Sarah L. Greene</u>
                                   Sarah L. Greene
                                   Brenner & Brenner
                                   P.O. Box 787
                                   Carrboro, NC 27510
                                   (919) 260-4077

                                   *Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on May 8, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all the registered CM/ECF users.

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Shelly N. Gannon
Shelly N. Gannon
*Gibson*Moore Appellate Services, LLC
206 East Cary Street
P.O. Box 1460 (23218)
Richmond, VA  23219
(804) 249-7770 – Telephone
(804) 249-7771 – Facsimile
shelly@gibsonmoore.net